OPINION OF THE COURT
Ernest L. Signorelli, S.
In this executors’ accounting proceeding, the copetitioners, the attorney-draftsman and the Bankers Trust Company, are requesting that the court fix and determine the fee and disbursements of the said attorney’s law firm, in the sum of $250,000, as well as fix and allow their combined commissions, in the total sum of $1,634,230.50. In conjunction therewith, counsel have requested that a hearing be held with respect to their application for fees and disbursements.
On the hearing date no one appeared in opposition to the relief requested by the petitioners. Significantly, the Attorney-General, although advised of the hearing, and the purpose of the court in conducting same, chose not to participate, and *725 failed to make an appearance on the scheduled hearing date. In this regard, this Attorney-General has consistently refused and failed to fulfill his responsibilities to the people of this State as they relate to Surrogate’s Court matters. Nevertheless, despite the absence of objections to the relief sought, the court has the inherent and statutory power to supervise the charging of fees for legal services rendered (Gair v Peck, 6 NY2d 97 [1959]; Matter of First Natl. Bank v Brower, 42 NY2d 471, 474 [1977]; cf, Judiciary Law §§ 53, 90; art 15), and to limit compensation to such sum as appears to be just and reasonable under the circumstances. In fact, what constitutes reasonable compensation has long been recognized as a proper exercise of discretion and well within the scope of the court’s authority. (Matter of Lanyi, 147 AD2d 644 [2d Dept 1989]; Matter of Von Hofe, 145 AD2d 424 [2d Dept 1988].)
The decedent died, testate, on the 7th day of April 1987, survived by one grandnephew. Pursuant to the pertinent provisions of her last will and testament, dated October 6, 1979, the decedent devised and bequeathed her entire estate, amounting to approximately $46 million on the date of her death, to two charitable organizations, the American Cancer Society, Inc., and Memorial Hospital for Cancer and Allied Diseases of New York, and nominated and appointed her attorney, John J. Barrett, and the Bankers Trust Company of New York, as the executors to act thereunder.
On the 18th day of June 1987, the decedent’s last will and testament was admitted to probate, and letters testamentary issued thereon to the nominated cofiduciaries, pursuant to a decree which, in pertinent part, directed the executors to file an account with the court within a prescribed period of time, and prohibited any legal fees and/or commissions from being paid without further court order.
The said decretal paragraph was incorporated in the probate decree pursuant to a local court rule which this court promulgated on October 1, 1986. The need for this type of remedial court rule governing attorney-fiduciaries became apparent as a result of an alarming increase in estates involving attorney-fiduciaries and the abuses resulting from this relationship thereby necessitating the court’s intervention.
Upon review of the petitioners’ account, and the pleadings and affidavits submitted in support of the relief sought, the court, at counsel’s request, scheduled the matter for a hearing, and afforded all persons interested in the estate the opportu *726 nity to appear and be heard thereat. In addition, the court directed counsel, to produce, in advance of the hearing, certain specified documents, and ordered that the member of the corporate cofiduciary’s trust and estates department, who handled this estate’s account, as well as a legal assistant employed by the attorney cofiduciary’s law firm, be present at the hearing, prepared to testify.
The decedent was born in 1888. She earned the substantial part of her fortune as a result of her marriage to her first husband in 1930, with whom she ran a fragrance business in France. In 1940, the decedent and her husband came to New York, where they continued their business. It was at or about this time that they opened an account with the Bankers Trust Company of New York, which continued throughout her lifetime to serve her banking needs and the preparation of her income tax returns.
In 1941, the decedent’s first husband passed away. In or about 1946, she married her second husband. Her attorneys at this time were Sullivan and Cromwell, whom she retained to prepare a prenuptial agreement and, in 1950, a will.
In 1962, the decedent retained John Keating to replace Sullivan and Cromwell as her attorney. Subsequent to the death of Mr. Keating in 1967, and continuing until the date of her death in 1987, the attorney-fiduciary, who was introduced to her by the said John Keating, acted as her counsel performing various legal services for her. In a letter dated July 11, 1969, the attorney-fiduciary informed the decedent that in line with his firm’s practice, she would derive a benefit from a reduced billing rate for lifetime services rendered on her behalf, with the expectation that uncompensated time would be remunerated via the legal fees which the firm would charge as counsel for her estate. Specifically the contents of this correspondence state, in pertinent part, as follows:
"Dear Madeleine * * *
"You have asked me to send you bills for the work I have done for you. They are enclosed herewith.
"These are in line with our practice, which I believe is almost universal, to keep charges for wills at a minimum in the expectation that uncompensated time will be covered by the charge to be made for the probate of the will, and the administration of the estate, a charge which will be deductible for estate tax purposes so that, in substantial measure, it will be borne by the government”.
*727 Pursuant to the pertinent provisions of the testamentary instrument dated August 17, 1968, the attorney-fiduciary was nominated to serve as executor, together with the decedent’s husband, and the Bankers Trust Company of New York. He stated that his appointment as cofiduciary with the decedent’s husband was at the decedent’s suggestion. However, admittedly it was he who suggested to her that she nominate the Bankers Trust Company as a cofiduciary.
In her prior wills for the years 1950, 1962 and 1964, the said bank had been named as an alternate executor. Over the years, the bank’s personnel made a concerted effort to "cultivate” the decedent with the hopes and expectations of being appointed as her primary fiduciary. This effort is reflected in various internal bank memoranda, as follows:

Letter, dated October 19, 1961

"Dear Mrs. Corya: * * *
"I do want you to know that our bank considers you * * * as among our very important customers and holds you both in the highest esteem. The sad expression on my face which you said you saw was only because of your naming an individual as sole trustee * * * I would have the same concern in regard to any individual you named as sole trustee * * * and no concern whatsoever had you named any corporate trustee such as a bank. I am enclosing a small 12 page book which I wish you would read at your convenience. This book explains better than I can in a letter why a corporate trustee is a better choice than an individual
"Harold J. Merz "Tax Section”.

Memorandum, dated December 4, 1967

Madeleine Daltroff Corya

"Later in 1961 we had some discussions with Mr. Keating when he prepared an irrevocable trust for Mrs. Corya with a vested charitable remainder interest. At that time, Mr. Keating was appointed as sole trustee of this trust, although Mr. Harold Merz * * * advised strongly against naming an individual and attempted unsuccessfully to obtain the appointment for Bankers Trust Company * * *
"When Mr. Harold Merz died several years ago, Mr. Gene Smith and Mr. Fred Schneider continued the personal contacts with Dr. and Mrs. Corya but this relationship was *728 restricted to tax questions. Efforts by the Banking Department and the Trust Department to broaden the relationship were unsuccessful. However, Fred Schneider gained their confidence * * * Because of the importance of this relationship it was agreed that we should take full advantage of this opportunity to develop a relationship which we had, in the past, been unable to do * * *
"I.E. White”.
The ultimate success of the attorney-fiduciary’s efforts in having Bankers Trust appointed to serve with him as cofiduciary of the decedent’s estate is memorialized in an internal bank memorandum, dated August 6, 1968, from R. H. Wood to Mr. Malcolm A. Stevenson. Said memorandum states, in pertinent part, as follows:

"Madeleine D. Corya Will File

"Jack Barrett called me today to report on his progress in having Mrs. Corya revise her Will to have Bankers Trust Company named in a primary capacity as executor and trustee. I won’t go into the background and the difficulties we have had in approaching Mrs. Corya on this matter, but Jack told me he has finally been successful in having the Will revised and he hopes that she will execute it this coming weekend. In his discussions with Mrs. Corya he said she did not understand why it would be necessary to have a bank as executor and trustee as she wanted to give all of her estate to charity and have the charities take care of Dr. Corya. Jack was finally able to convince her that this was not a feasible solution and that Bankers Trust Company should be named as executor and trustee. She has agreed to this and additionally, will name her husband and Jack Barrett as co-executors and co-trustees. Jack has told me he has agreed with Mrs. Corya that he will not charge an executor’s fee since he will also be attorney for the Estate. Bankers Trust Company will be the only executor receiving a commission . . . Once this new Will has been signed, I would seriously doubt whether there will ever be any other changes made in the Will in view of the advance ages of both Dr. and Mrs. Corya. We were initially responsible for getting Jack involved in this matter, although he has known the Corya’s before, and if the Will is executed as planned, we can thank him for his fine efforts in keeping us in the picture. Mrs. Corya’s estate should be about $15,000.00.
"R. H. Wood” (emphasis added).
When the decedent’s husband died in 1971, a new will was *729 prepared on her behalf. Subsequent to the preparation and execution of the decedent’s 1971 will, the attorney-fiduciary prepared approximately five additional wills for the decedent before she passed away. He gave contradictory testimony regarding these wills concerning whether he informed the decedent of the financial impact of his acting as fiduciary together with the Bankers Trust Company. When questioned by the court, he could offer no rational explanation for the necessity of nominating multiple fiduciaries in the decedent’s wills. Curiously, he stated that having the Bank serve with him jointly "seemed like the right thing to do”. When further questioned by the court as to the necessity of burdening the estate with multiple commissions, counsel responded "you get a better job done if you have a combination of a corporate fiduciary and an individual fiduciary.” He further testified that the administration of the decedent’s estate would be enhanced by the expertise and skill of two resources who were most familiar with her affairs and dispositive wishes. However, when he was asked why this goal could not have been equally accomplished with the appointment of only the corporate fiduciary and his employment as the attorney for the estate, counsel answered by reiterating that "a better job gets done with a corporate and an individual fiduciary”.
Parenthetically, the attorney-fiduciary volunteered the information that this decedent, although possessed of considerable wealth, was extremely conscious of her bills and expenditures, and, as a matter of fact, was frugal. As an illustration of her frugality, counsel relayed to the court that at the age of 87, the decedent, who could have easily have afforded the hiring of a chauffeured limousine, however, chose to drive herself to her Florida residence.
Significantly, the attorney-fiduciary virtually delegated to the Bank to do what was necessary to bring this estate to fruition. The Bankers Trust Company, the cofiduciary herein, performed all the essential executorial functions, i.e., marshaled and liquidated the decedent’s assets, determined estate debts, prepared the estate inventory, arranged for the distribution of assets, and prepared the income and gift tax returns of the decedent, as well as the fiduciary income tax returns of her estate.
The provisions of SCPA 2307 (1) mandate the payment of statutory commissions absent a showing of misconduct or mismanagement on the fiduciaries’ part arising during the *730 administration of the estate. (SCPA 2307 [1]; Matter of Harris, 123 Misc 2d 247 [1984]; Matter of Thron, 139 Misc 2d 1045 [1988].) However, the law requires that the appointment of a fiduciary under a will be the result of a free and voluntary selection by the testator. Where the appointment is found to be the result of fraud and overreaching exercised upon the testator, the appointment will be barred, or, alternatively, commissions to the fiduciary may be denied. (Matter of Weinstock, 40 NY2d 1 [1976]; Matter of Becker, 104 AD2d 444 [2d Dept 1984]; Matter of Thron, supra; see, Matter of Harris, supra; Matter of Laflin, 111 AD2d 924 [2d Dept 1985].)
In Matter of Weinstock (supra, at 5), the Court of Appeals held that the relationship between the attorney-fiduciaries and the testator, imposed upon counsel a "special obligation both of full disclosure and fair dealing.” The court further held that counsel’s failure to fulfill these obligations constituted a constructive fraud, and served as grounds for denying both attorneys their appointment as fiduciaries. In reaching this result, the court emphasized the duties imposed upon counsel by the New York Code of Professional Responsibility, to wit, EC 5-6, which precludes a lawyer from consciously influencing a client to name him as executor in an instrument. "In those cases where a client wishes to name his lawyer as such, care should be taken by the lawyer to avoid even the appearance of impropriety.” (EC 5-6.)
"By employing the phrase 'consciously influence’, the Code seeks to interdict conduct involving far less psychological pressure than the more customarily encountered notion of 'undue influence’ that vitiates an entire will. As such, the Code prohibits not only the foisting of unsolicited executorial services upon a client, but seeks to avoid even the appearance of such conduct by condemning all acts of 'overreaching’ ” (Ryan, Attorney-Draftsman as Executor, The Man in the Mirror, Nassau Lawyer, Sept. 1988 [emphasis added]).
Subsequent to the decision in Matter of Weinstock, courts have interpreted and expanded its aims so as to insure that a testator’s selection of an attorney-fiduciary is made with a full understanding of the economic consequences such a selection might have on his estate. (Matter of Thron, supra; Matter of Laflin, supra.) Some courts have sought to curtail the ethical transgressions observed by the Weinstock court, and this court, in particular, has promulgated rules which require an affidavit from the testator setting forth the circumstances surrounding counsel’s appointment as fiduciary, and whether *731 the testator was informed of the financial impact of the appointment.
When the attorney-fiduciary prepared the decedent’s 1968 will, she was led to believe that her estate would be encumbered with merely one commission, notwithstanding the fact that there were nominated in that will three fiduciaries, i.e., her husband, the attorney-fiduciary herein, and the Bankers Trust Company. The memoranda hereinabove referred to clearly indicate that this decedent was caught in a pincer movement between the attorney-fiduciary herein and the Bankers Trust Company. They acted in concert to convince this decedent, who was concededly parsimonious in nature, to nominate the Bankers Trust Company to serve as a cofiduciary with the attorney-fiduciary. Indeed, the memorandum, dated August 6, 1968, hereinabove referred to, clearly demonstrates that the decedent was unwilling to nominate the bank inasmuch as she did not see the need to have two fiduciaries administer her estate.
The court, consequently, is constrained to find that the nomination of the attorney-fiduciary and the bank was the result of the acts of overreaching and constructive fraud perpetrated upon the decedent by the attorney-fiduciary-draftsman and various employees of the Bankers Trust Company. Moreover, the attorney-fiduciary’s offering a client a discount fee for legal services rendered while she was alive, presumably in exchange for his nomination as a fiduciary, violates at least the spirit of the foregoing Canons of Professional Responsibility.
Accordingly, one commission is hereby awarded to the petitioners for the executorial services which were performed herein. Any commissions received by the petitioners in excess of said sum shall be repaid to the estate, and proof of such repayment shall be submitted to the court within 10 days of the date hereof.
With respect to the legal fees requested by the attorney-fiduciary, the majority rule appears to be that in the absence of statute otherwise providing, an executor or administrator is not entitled to extra compensation for legal services rendered by him. The rationale for this rule was stated in Willard v Bassett (27 Ill 37, 38-39) as follows: "the authorities are uniform that this should not be allowed, and every principle of sound policy forbids it. The law cannot permit the idea that a person can take the office of executor or administrator as a *732 business, or as a means of making money. It must ever associate with that place, to a certain extent, the idea of benevolence or philanthropy. We must ever assume that whoever takes such a position is actuated by an impulse of generosity and a desire to do good to others, rather than to make it a source of profit to himself. He must not be expected to suffer loss in the discharge of his duties, hence he must be allowed his necessary disbursements, and a reasonable compensation for the time and trouble bestowed upon the business of the estate. But beyond this the court should never go. If [a personal representative] chooses to exercise his professional skill as a lawyer in the business of the estate, that must be considered a gratuity. To allow him to become his own client and charge for professional services in his own cause, although in a representative or trust capacity, would be holding out inducements for professional men to seek such representative places to increase their professional business, which would lead to most pernicious results. This is forbidden by every sound principle of professional morality as well as by the policy of the law”. In New York, the same rule of law prevailed until the enactment of an amendatory statute in 1914, which authorized the Surrogate to award an executor compensation for legal services rendered. Therefore, prior to 1914, the law in the State of New York precluded an executor or administrator from seeking extra compensation for legal services rendered in connection with an estate. Furthermore, the cases held that where an executor or administrator was a member of a law firm which rendered legal services, additional legal compensation to that firm would not be sanctioned. (See generally, Annotation, Right of Executor or Administrator to Extra Compensation for Legal Services Rendered by Him, 65 ALR2d 809; Collier v Munn, 41 NY 143 [1869]; Matter of Wallach, 164 App Div 600 [1st Dept 1914].)
Although the fee requested, herein, amounts to less than 2% of the decedent’s gross estate, valued at $46,000,000, this court does not sanction the practice of utilizing a fixed percentage as a guidepost in assessing the reasonableness of counsel fees. (See, Goldfarb v Virginia State Bar, 421 US 773 [1975]; Matter of Young, 52 Misc 2d 398 [1966].) For far too long, this practice has been considered by members of the Bar as a viable measuring rod for evaluating the worth of legal services. However, the utilization of this measuring yardstick, particularly in large estates, results in a fee which often bears no relationship to the actual work performed. Counsel fees, *733 particularly where there is no retainer agreement, should be assessed on a quantum meruit basis and in accordance with the general criteria established by the courts in Matter of Freeman (34 NY2d 1, 9 [1974]) and Matter of Potts (213 App Div 59, affd 241 NY 593 [1925]), to wit: the time spent, the difficulties involved in the matter, the nature of the services rendered, the amount involved, the professional standing of counsel, and the results obtained.
As an aside, where is it written that simply because the attorney-fiduciary fortuitously provides legal services to himself that he, ipso facto, is entitled to a substantial partnership interest in the decedent’s estate assets?
Also to be factored into this analysis are the ethical proscriptions against the charging of excessive legal fees set forth in the New York Code of Professional Responsibility:
"DR 2-106. Fees for Legal Services
"(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.
"(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
"(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
"(3) The fee customarily charged in the locality for similar legal services.
"(4) The amount involved and the results obtained.
"(5) The time limitations imposed by the client or by the circumstances.
"(6) The nature and length of the professional relationship with the client.
"(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
"(8) Whether the fee is fixed or contingent”.
"Financial Ability to Employ Counsel:
"Persons Able to Pay Reasonable Fees
"EC 2-17. The determination of a proper fee requires consid *734 eration of the interests of both client and lawyer. A lawyer should not charge more than a reasonable fee, for excessive cost of legal service would deter laymen from utilizing the legal system in protection of their rights. Furthermore, an excessive charge abuses the professional relationship between lawyer and client. On the other hand, adequate compensation is necessary in order to enable the lawyer to serve his client effectively and to preserve the integrity and independence of the profession.”
The American Bar Association’s Model Rules of Professional Conduct contain similar prohibitions against the charging of excessive fees. (DR 2-106, "Fees for Legal Services”; Model Rule 1.5, "Fees”.)
Finally, the court must consider the fact that the attorney, herein, is requesting, and has, in fact, received a partial award of statutory commissions for his services as fiduciary. In such instances, the law is settled that "absent special circumstances an attorney-executor cannot be paid full compensation [for services rendered] in both capacities.” (Matter of Carlisle, 142 Misc 2d 657, 661 [1989], and cases cited thereunder.) Undoubtedly, this rule is predicated upon the observation that when one individual wears two hats, namely serves as both an attorney and an executor of an estate, there is an overlapping of executorial and legal services which necessarily must result in the reduction of the legal fee requested. (In re Estate of Schmidberger, file No. 161 P 1988, Feb. 21, 1990 [Sur Ct, Suffolk County]; see, Matter of Thron, supra, at 1050-1051; Matter of Moore, 139 Misc 2d 26 [1988].)
The attorney-fiduciary claims that together with members of his firm, 975.82 hours were expended in the performance of legal services rendered to this estate at varying rates ranging from $50 per hour to $300 per hour for time expended by legal assistants, associates, and partners, respectively.
While it has been held by this court, and others, that the time spent is the least important part of the calculus in fixing counsel fees (Matter of Kentana, 170 Misc 663 [1939]), it is the starting point from which the court may begin to assess the reasonableness of the sum requested. The attorney-fiduciary is seeking to recover a legal fee in the sum of $235,000, although his law firm’s time records sustain a fee of $145,000. While he acknowledges that this discrepancy exists, he, nevertheless, maintains that his firm is entitled to a bonus award of $90,000, by virtue of the size of the estate, and the services *735 which he claims were rendered in connection with its administration.
Clearly, while the size of an estate is a factor to be considered in the fixation of legal fees, it does not necessarily have any correlation to the difficulty of the work required to bring it to fruition, and thus, would not a fortiori warrant an award of fees in excess of hourly charges, as counsel suggests. (See Matter of Martin, 21 AD2d 646, affd 16 NY2d 594 [1965].) Moreover, while the court recognizes that in actual dollar amount the gross valuation of this estate is substantial, there were no complex legal issues or litigation involved in its administration, nor were there any construction or tax problems since the bulk of this estate was bequeathed to charitable institutions.
With regard to the ancillary administration of the decedent’s estate in Florida, payments of approximately $3,700 were made to Florida counsel, who essentially performed all of the necessary services, to wit, the preparation and filing of a petition for ancillary probate, and the sale of the decedent’s Florida realty. Curiously, the attorney-fiduciary’s law firm decided to prepare the accounting instead of authorizing this phase of the legal work to be done by the Florida attorneys. In contradistinction to the relatively modest amount billed by the said Florida law firm, the attorney-fiduciary’s law firm is seeking $15,500 covering billable hours of 80.65 hours for services rendered for this phase of the work virtually performed by Florida counsel.
Incredibly, the attorney-fiduciary, who professes to have expertise in the field of trusts and estates, states that his law firm expended 94.85 hours on what admittedly was a routine uncontested probate proceeding entailing the filing of a petition with the court for probate and preliminary letters testamentary, together with citation, an affidavit of heirship, and affidavits of the attesting witnesses. (See, In re Estate of Doyle, NYLJ, July 10,1989, at 31, col 5 [Sur Ct, Bronx County].)
In addition to the probate proceeding, the attorney-fiduciary’s law firm arranged for the sale of the decedent’s New York realty, and prepared the necessary receipts and releases upon the distribution of estate assets.
Many of the time records submitted by various partners and associates of counsel’s firm are couched in such vague terms, as "probate matters” and "administration matters”, that it is impossible for the court to determine whether the work per *736 formed was legal or executorial in nature, and thus, a reasonable charge against the estate. In fact, counsel admitted that although there is frequently an overlapping of fiduciary and legal services, his firm did not maintain a separate log for executorial time expended.
Since this large estate was “tax free”, its assets bequeathed to charities, the court can find no justification in the firm’s requested fee of $28,797.20 for the expenditure of 178.77 hours in connection with the estate tax proceedings and the instant accounting proceeding, when counsel retained and paid accountants the sum of $12,000 to prepare the requisite returns and accounting schedules, for which they are seeking reimbursement, herein. Equally unwarranted is counsel’s request for a fee of $3,896 for services performed in connection with the income and gift tax returns of the decedent, when admittedly, these returns were prepared by the corporate cofiduciary and simply reviewed by the firm. Likewise, counsel cannot be compensated for their efforts expended in liquidating the decedent’s stock portfolio, and in preparing an estate inventory, as such services were executorial rather than legal in nature. (See, In re Estate of Kaufman, NYLJ, July 7, 1978, at 14, col 3 [Sur Ct, Bronx County]; In re Estate of Mick, NYLJ, Jan. 16, 1987, at 13, col 2 [Sur Ct, Bronx County]; see generally, 41 NY Jur 2d, Decedents’ Estates, § 2024 et seq.; 3 Warren’s Heaton, Surrogates’ Courts § 218 [1].)
Finally, while counsel seeks to charge the estate for paraprofessional time expended in connection with its administration, in the court’s opinion, the fee for these services should be absorbed by the firm as office overhead, rather than be separately billed as an estate expense. (In re Estate of Laing, NYLJ, Dec. 6, 1979, at 13, col 5 [Sur Ct, Queens County]; cf., Matter of Goldstein, 134 Misc 2d 57 [1986].)
In summary, therefore, many of the essential legal services that needed to be performed on behalf of this estate were performed by others, i.e., the services with regard to the ancillary administration proceeding in Florida were performed by Florida counsel, the Federal and New York State estate tax returns were prepared by outside accountants, the instant accounting proceeding was prepared by outside accountants, and the income and gift tax returns of the deceased were prepared by the cofiduciary herein.
Accordingly, in assessing the reasonableness of counsel’s fee in view of the foregoing, and the broad criteria established by *737 the courts in Matter of Freeman (supra) and Matter of Potts (supra), the court fixes and determines the value of counsel’s services to be in the sum of $75,000, for all services rendered and to be rendered, through the submission of the decree herein and distribution thereunder.
Counsel’s request to be reimbursed the sum of $12,268.75 for accountants’ fees paid by them is denied, inasmuch as they have failed to demonstrate that unusual circumstances existed in this estate which would have required the expertise of an accountant. (See, Matter of Kramer, 70 NYS2d 239 [1947]; Matter of Badenhausen, 38 Misc 2d 698 [1963]; In re Estate of Bloch, NYLJ, May 20, 1987, at 15, col 6 [Sur Ct, Westchester County].) Disbursements requested by counsel, amounting to $994.31, for travel are denied, inasmuch as such expenditure ordinarily constitutes office overhead (In re Estate of Lee, NYLJ, June 29, 1988, at 24, col 3 [Sur Ct, Bronx County]; Matter of Wolz, NYLJ, Dec. 6, 1983, at 13, col 5 [Sur Ct, Westchester County]), and, moreover, that portion thereof relating to counsel’s trip to Florida was for the performance of an executorial, rather than a legal service. Disbursements for messengers and Lexis, amounting to $761.47 are also denied, inasmuch as such expenditures constitute office overhead and are not reimbursable. (In re Estate of Lee, supra; In re Estate of Arcentales, NYLJ, July 15, 1986, at 11, col 4 [Sur Ct, NY County].) The balance of counsel’s requested disbursements are allowed in the sums requested.