OPINION OF THE COURT
Ernest L. Signorelli, S.
Following the death of the decedent and for a period of eight years, the administration of this estate has been plagued by the many conflicts of interest of the attorney-draftsman serving as cofiduciary and counsel for the estate. Objections to the attorney-draftsman’s and corporate fiduciary’s accounting have been filed by the decedent’s spouse, a cofiduciary, and her son.
The decedent died, on the 11th day of November 1983, survived by her spouse and three children from a prior marriage. Her estate, at death, was valued at $4,000,000, and consisted primarily of cash, jewelry, tangible personalty, realty, and appointive trust property.
Pursuant to the pertinent provisions of her last will and testament, dated September 5, 1978, the decedent specifically devised and bequeathed her realty, tangible personal property, and the residue of her estate to her spouse. Additionally, the decedent exercised powers of appointment that she held under a 1941 inter vivas trust instrument, and two testamentary trusts created under the wills of her predeceased parents and grandmother.
In article eleventh of the instrument, the decedent nominated and appointed her spouse, her attorney, and Morgan Guaranty Trust Company of New York as the executors of her estate, and further provided that they should receive commissions for their services as follows: "I direct that my Executors shall be entitled to receive executors’ commissions with re *865 spect to (a) all real estate specifically devised by me in this Will, (b) all tangible personal property specifically bequeathed by me in this Will, and (c) all appointive property disposed of hereinabove as if I had owned all of the same in my own right and the same had been disposed of by residuary disposition.”
On the 21st day of May 1984, the last will and testament of the decedent was admitted to probate, and letters testamentary issued to said fiduciaries. Thereafter, the instant accounting proceeding was filed with the court by the attorney-draftsman and the corporate cofiduciary. The decedent’s spouse refused to endorse said accounting, and, in fact, filed objections relating to the validity of the attorney-draftsman’s appointment as coexecutor of the decedent’s estate, as well as the commissions clause under article eleventh of her will, and the reasonableness of the legal fees sought by counsel for the fiduciaries.
The decedent’s son, a claimant of the estate, also objected to the petitioners’ account requesting that the court award him interest for moneys advanced to the decedent. The moneys were borrowed from an inter vivas trust created for the benefit of the son whose trustees were the son and the attorney-draftsman. Additionally, in support of said claim, the decedent’s son, individually, and as cotrustee of the aforesaid trust, commenced an action at law in this court to recover the interest on said loan, reimbursement for income taxes assessed against him and for restitution. Subsequently, the court issued an order consolidating the issues raised in the contested accounting and action at law.
Prior to the conclusion of this trial, and upon the court’s recommendation, the litigation relating to the decedent’s son was settled pursuant to the terms of a stipulation placed on the record. Additionally, the objection relating to legal fees was submitted to the court, in lieu of an evidentiary hearing, predicated upon counsel’s affidavits of legal services, and answering papers filed by the objectant in opposition thereto.
The remaining issues for trial were as follows:
As To The Accounting Proceeding

"Issue #1:

"Should Donald Vail, Esq., the attorney-cofiduciary, be denied commissions on the ground that his nomination as a co-executor of this estate was the result of overreaching and fraud on his part?

*866
"Issue #11:

"Was Article Eleventh of the decedent’s will, that permits the executors of this estate to include in the computation of their commissions property that was specifically bequeathed and devised, as well as property over which the decedent had a power of appointment, the product of overreaching and fraud on the part of the said attorney-fiduciary-draftsman?

"Issue #111:

"Is the insertion of such a provision in a will against public policy?

"Issue #IV:

"If issues numbered II and/or III are decided in the affirmative, how should commissions be computed with regard to:
"a. attorney-fiduciary
"b. corporate-fiduciary.

"Issue #V:

"Is the objectant, Klenk, barred by the doctrine of estoppel from raising Issues I through III?”
The petitioners contend that the objectant spouse should be estopped from raising the issues numbered I through III pertaining to counsel’s nomination as an executor and the inclusion of article eleventh in the decedent’s will. Petitioners argue that almost at the inception of the administration of the estate, the objectant spouse was represented by separate counsel.
The reported cases on this subject do not support petitioners’ reliance on the doctrine of estoppel. The fact that the objectant spouse did not initially object to the attorney-draftsman’s nomination at the probate stage will not preclude him from raising the issue of constructive fraud and overreaching as to his nomination at the accounting stage. In Matter of Laflin (111 AD2d 924 [2d Dept 1985]), and Matter of Harris (123 Misc 2d 247 [1984]), both courts, in dealing with an executor’s accounting proceeding, refused to dismiss objections raised to the commissions requested by the attorney-fiduciarles on the ground that their appointment was procured by overreaching and constructive fraud. The court in Matter of Harris (supra), stated that only a countermanding compelling equitable reason would warrant foreclosing such an inquiry at the accounting stage of an estate administration. Moreover, and, in any event, the court on its own initiative, may inquire *867 into the circumstances surrounding an attorney-fiduciary’s nomination to satisfy itself that such nomination was not the product of overreaching or fraud.
Consequently, the decedent’s spouse is not barred by the doctrine of estoppel herein, and issue No. V is resolved in favor of the objectant spouse.
The attorney-draftsman initially met the decedent in the 1950’s when she retained his former law firm to prosecute a right of election which she exercised in connection with her late husband’s estate. Thereafter, over the years, counsel’s law firm sporadically represented the decedent, as well as her second husband, with regard to various business and personal legal matters.
Commencing in May 1958, counsel prepared 10 wills for the decedent. In nine of these instruments, he, as well as Morgan Guaranty Trust Company of New York, were nominated as cofiduciaries of her estate, and, in 1976 and 1978, the decedent’s husband was nominated as a third cofiduciary.
The record reveals that counsel did not enjoy a close relationship with the decedent. He testified that he had last seen the decedent some 5 to 6 years prior to her death. On one occasion, the decedent became irate concerning a bill presented to her by counsel’s law firm. Additionally, when she was virtually on her death bed, she told her spouse that she was dissatisfied with her counsel and, accordingly, wished to amend her will removing him as an executor.
Similarly, the decedent did not enjoy an amiable relationship with the corporate cofiduciary and, according to the testimony of an officer of the bank, the bank would have terminated its banking relationship with her had it not been for the fact that the decedent’s grandfather had been its cofounder.
The decedent was an alcoholic, having been hospitalized on two occasions for treatment. The hospital record describes her as suffering from "acute alcoholic intoxication, DT’s, dehydration and chronic alcoholism.” Her spouse testified that the decedent drank continually and was perpetually in an "alcoholic haze”. The attorney-draftsman denied that she was an alcoholic in spite of the spouse’s testimony that the decedent’s alcoholism was the subject of discussion on a number of occasions. Notwithstanding the attorney-draftsman’s statements to the contrary, and especially in view of the lack of physical contact he had with the decedent, she was palpably *868 unable to manage her affairs as a result of her continuous state of intoxication.
The decedent was possessed of considerable wealth derived, in part, from the estate of her former spouse, and two trusts created under the wills of her parents and grandmother. However, during the course of her lifetime, the considerable assets which she had inherited were in the process of being depleted, undoubtedly due, in part, to her alcoholism. Her assets dwindled to such an extent that she was advanced moneys approximating some $800,000 from her son’s trust, hereinafter referred to as the "Ryan Trust”.
At or about the time of her hospitalization, in July 1978 and December 1978, counsel drew the decedent’s will, dated September 5, 1978, which was ultimately admitted to probate. Counsel testified that he did not discuss the nomination of the executors or the issue of legal fees or commissions with the decedent on the occasion of the preparation and execution of her 1978 will since he claims he had previously discussed these matters with her when he prepared her earlier 1976 will. However, his file contains no notes memorializing this conversation had with the decedent.
At no time did the attorney-draftsman suggest that the decedent seek independent counsel to prepare either one of the instruments, nor did he apparently consider it a wiser, and indeed, more ethical course to refuse to serve as fiduciary.
He further testified that when he discussed the 1976 will with the decedent he stated to her that if the will did not include article eleventh, the enhanced commissions clause, neither he nor the bank would agree to serve as an executor. In explaining the necessity for including this clause, he stated that since her assets had been dwindling and she had personally accumulated considerable debt, it would not be practicable for them to serve as executors without its inclusion.
In any event, the attorney-draftsman and the bank testified that at no time did the bank have knowledge of article eleventh prior to the decedent’s death. There was, however, introduced into evidence a letter dated December 20, 1968 from Paul D. Hicks, Jr., assistant trust officer of Morgan Guaranty Trust Company, addressed to the attorney-draftsman, which reads as follows: "Enclosed are copies of various pages extracted from the will and trust agreement on which I have noted some suggestions. As we mentioned, if Morgan Guaranty is not acting as a trustee under the new trust *869 agreement at the time of Mrs. Klenk’s death, we would want the will to provide for our executor’s commission to be based on the entire gross taxable estate less 1% of such amounts as are transferred to the executors for payment of death taxes. This would be substantially the same provision which appears in the trust agreement. / am enclosing some language on this point for your consideration. We would be happy to discuss this with Mrs. Klenk if you would prefer. If you have any questions on any of these ideas, please do not hesitate to call me.” (Emphasis added.)
Furthermore, in an affidavit which the attorney-draftsman supplied to the court, he states as follows: 'T explained to [the testatrix] that neither the Bank nor I would be willing to qualify as Executors if commissions were to be computed in the routine manner and would be based exclusively on probate property excluding real estate specifically devised and tangible personal property bequeathed because the Testatrix had very little such property.”
A local East Hampton attorney who was retained by the attorney-draftsman to supervise the execution of the 1978 will, as well as the prior will executed in 1976, testified that the attorney-draftsman had informed him that the bank required the enhanced commissions clause before it would qualify. Admittedly, he did not explain to the decedent the financial impact of article eleventh prior to the execution of the will. Significantly, its inclusion in the will cost the estate approximately $200,000 in additional executorial commissions.
The provisions of SCPA 2307 (1) mandate the payment of statutory commissions absent a showing of misconduct or mismanagement on the fiduciary’s part arising during the administration of the estate. (See, Matter of Harris, supra; Matter of Thron, 139 Misc 2d 1045 [1988].) However, the law requires that the appointment of a fiduciary under a will be the result of a free and voluntary selection by the testator. Where the appointment is found to be the result of fraud and overreaching exercised upon the testator, the appointment will be barred, or, alternatively, commissions to the fiduciary may be denied. (Matter of Weinstock, 40 NY2d 1 [1976]; Matter of Becker, 104 AD2d 444 [2d Dept 1984]; Matter of Thron, supra; see, Matter of Harris, supra; Matter of Laflin, supra.)
Where a client seeks to nominate his attorney as fiduciary of his estate, Code of Professional Responsibility EC 5-6 requires counsel to take the following precautionary steps: "A *870 lawyer should not consciously influence a client to name him as executor, trustee, or lawyer in an instrument. In those cases where a client wishes to name his lawyer as such, care should be taken by the lawyer to avoid even the appearance of impropriety.”
In Matter of Weinstock (supra, at 5), the Court of Appeals held that the relationship between the attorney-cofiduciaries and the testator imposed upon counsel a "special obligation both of full disclosure and fair dealing.” The court further held that counsel’s failure to fulfill these obligations constituted constructive fraud, and served as grounds for denying both attorneys their appointment as fiduciaries. In reaching this result, the court emphasized the duties imposed upon counsel by the Code of Professional Responsibility, to wit, EC 5-6, which precludes a lawyer from consciously influencing a client to name him as executor in an instrument. "By employing the phrase 'consciously influence’, the Code seeks to interdict conduct involving far less psychological pressure than the more customarily encountered notion of 'undue influence’ that vitiates an entire will. As such, the Code prohibits not only the foisting of unsolicited executorial services upon a client, but seeks to avoid even the appearance of such conduct by condemning all acts of 'overreaching’ ” (Ryan, Attorney-Draftsman as Executor, The Man in the Mirror, Nassau Lawyer, Sept. 1988 [emphasis added]).
Subsequent to the decision in Matter of Weinstock (supra), courts have interpreted and expanded the parameter of its holding to make certain that a testator’s selection of an attorney-draftsman is made with a full understanding of the economic consequences such a selection might have on his estate. (Matter of Thron, supra; Matter of Laflin, supra.) This court has promulgated rules requiring an affidavit from a testator setting forth the circumstances surrounding counsel’s appointment as fiduciary, and whether the testator was informed of the financial impact of the appointment.
In addition to the Weinstock considerations, this attorney-draftsman was confronted with perhaps a more serious ethical problem pertaining to his having agreed to act as cofiduciary and counsel for the estate knowing that he faced serious critical potential conflicts of interest.
Loyalty is the essential ingredient in the relationship of attorney and client. A lawyer who agrees to represent a client shall exercise his professional judgment solely for the benefit *871 of his client divorced from any competing consideration. Furthermore, if at the time of retention it is apparent that there exists an actual or potential conflict of interest then the attorney is ethically obligated to decline to act for the client. (Code of Professional Responsibility DR 5-105 [A]; DR 5-101 [A]; ABA Model Rules of Professional Conduct, rule 1.7.)
It is clear that the attorney-draftsman’s inclusion of article eleventh in the decedent’s will was self-serving and motivated by sheer greed, and it was, therefore, the product of constructive, if not actual fraud. "Constructive fraud may be defined as a breach of duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence or to injure public or private interests which the law deems worthy of special protection” (Brown v Lockwood, 76 AD2d 721 [2d Dept 1980]; cf., Matter of Corya, 148 Misc 2d 723 [1990]). Unlike actual fraud, which requires knowledge on the part of the perpetrator of his false representation, constructive fraud emanates from the existence of a fiduciary or confidential relationship whereby the trusting party reposes a confidence in the guilty party and, therefore, the trusting party does not exercise the care and vigilance that ordinarily would be exercised in a given situation. (Brown v Lockwood, supra.)
Significantly, the attorney-draftsman had no personal contact with the decedent before or after he drafted the will in question. He alleges that whatever discussions he had concerning this will were conducted by telephone. In fact, he failed to be present during the execution of this will and delegated this duty to a local attorney. Neither he nor the local attorney ever discussed with the decedent the financial implications of the enhanced commissions clause. Since the local attorney was not aware of the financial effect of article eleventh, he was, therefore, not in a position to make a proper analysis for the benefit of the decedent. Neither he nor the local attorney ever advised the decedent that the attorney-draftsman would be entitled to fees and commissions or that the enhanced commissions clause as drafted need not apply to the individual coexecutor. The attorney-draftsman admittedly was the one who suggested to the decedent the necessity for the enhanced commissions clause and then proceeded to draft and insert it in the will. According to his testimony, he disingenuously stated to the decedent that since her commissionable estate would be virtually nil, it was therefore essential that it be inserted in the will in order to placate the bank. *872 The fact is, however, that the decedent’s commissionable estate at the time of her death was valued at approximately $1,700,000 and was undoubtedly more valuable on the occasion of the execution of the 1978 will.
At no time did the attorney-draftsman advise the decedent that since the will essentially provided for the outright disposition to her husband that there was, therefore, no need for the nomination of multiple executors. At no time did he ever resist being nominated as coexecutor nor did he ever discuss any alternative with the decedent. Parenthetically, he admitted that he has served as a fiduciary on 50 prior occasions concerning wills which he has drafted. Never did he discuss with the decedent his many conflicts of interest.
While the decedent was alive she borrowed from her son’s trust considerable sums of money approximating $800,000. The moneys advanced to her were provided from the corpus of a trust which had been established for the benefit of her son. With regard to the "Ryan Trust”, which had been formulated by the attorney-draftsman in the year 1967, the attorney-draftsman was a cotrustee together with the son. Article sixth of the decedent’s will refers to this loan of money which had been advanced to her by the "Ryan Trust” and provides for the satisfaction of this indebtedness by the exercise of a power of appointment which had been granted to her in a trust created under her grandmother’s will. Upon the death of the decedent when an agreement for the repayment of this loan was entered into, the attorney-draftsman presumably wearing several hats acted as the cotrustee of the "Ryan Trust”, represented Ryan individually, and, at the same time, functioned as the coexecutor and the attorney for the decedent’s estate.
The agreement which purported to satisfy the decedent’s indebtedness owing to the "Ryan Trust” forgave any interest for the repayment of the loan which was to be repaid in installments. Thereafter, the Internal Revenue Service imposed a tax for the "imputed interest”. The decedent’s son then proceeded to file a claim against the estate for the reimbursement of this tax. The attorney-draftsman, in his capacity as coexecutor, then proceeded to disallow this claim although the claim emanated from a trust in which he was serving as cotrustee.
Prior to the decedent’s death she had entered into a contract for the sale of certain real property which she owned in *873 the Bahamas. This contract had expired subsequent to her demise. Although the will specifically devised this property to the decedent’s spouse, the attorney-draftsman continued negotiations for its sale, and at no time advised the decedent’s spouse, his coexecutor and sole beneficiary thereof, that he should be the one to convey title to this property. This is one of the estate assets for which commissions are being claimed under article eleventh of the decedent’s will, although specifically devised real property is not ordinarily commissionable. (SCPA 2307.)
On the occasion of the probate of the decedent’s will, the attorney-draftsman was involved in negotiations culminating in a family settlement agreement that was entered into in order to forestall a potential contest of the decedent’s will. During these negotiations, the attorney-draftsman was paid a fee from both the family trust and the estate.
The attorney-draftsman was obligated to avoid the foregoing conflicts which unfortunately resulted in litigation and brought about duplicative billing. When the family trust was being created, he suggested to the parties involved that he be nominated as trustee notwithstanding the fact that he was then acting as a cofiduciary of the decedent’s estate.
From this entire record it becomes inescapably clear that the decedent was never informed of the financial impact on her estate of her nomination of multiple fiduciaries, or of the inclusion of the enhanced commission clause in her will. In any event, had she been so informed, she lacked the intellectual capacity due to her alcoholism to appreciate its impact. The attorney-draftsman repeatedly contradicted himself in response to questioning by the court and counsel. His testimony can be best characterized by his lack of forthrightness and candor.
The court determines, therefore, that the attorney-draftsman is denied commissions since his nomination as a coexecutor, as well as the inclusion of the excess commissions clause as contained in article eleventh of the decedent’s will, resulted from overreaching and constructive fraud, if not actual fraud, committed by him. Accordingly, issues I and II are resolved in favor of the objectant spouse.
With respect to the corporate cofiduciary it is equally clear that it similarly had a duty and responsibility of undivided loyalty to this decedent and to her estate. Since it directly benefited from article eleventh it therefore was incumbent *874 upon the bank to ensure that the decedent fully comprehended its impact upon her estate. Moreover, the bank violated its trust and responsibility to this estate when it elected to retain the attorney-draftsman as estate counsel notwithstanding its awareness of counsel’s many conflicts of interest. "Many forms of conduct permissible in a workaday world for those acting at arm’s length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion’ of particular exceptions (Wendt v. Fischer, 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.” (Meinhard v Salmon, 249 NY 458, 464 [1928].)
Accordingly, the corporate cofiduciary is denied commissions pursuant to article eleventh, and, in lieu thereof, its commissions are to be calculated and awarded according to the statutory rate since it should not be permitted to profit from the wrongdoing of the attorney-draftsman. Moreover, the bank’s request that it be awarded commissions predicated upon services allegedly performed with regard to these non-probate assets is similarly denied in view of the fact that the executorial services which were rendered were not extraordinary in nature. Furthermore, some of these nonprobate assets were specifically devised, and any services rendered with regard to these assets and the responsibility for safeguarding these assets were the responsibility of the beneficiary.
In view of the foregoing, issue III is determined moot.
With respect to the issue of legal compensation, fees are being requested by four sets of attorneys retained by the petitioning fiduciaries. Initially, the corporate fiduciary and the attorney-draftsman were represented by the attorney-draftsman’s law firm, hereinafter referred to as the "former law firm”. That firm subsequently merged with a second law firm, which firm, hereinafter referred to as the "successor law firm” continued to represent the petitioners herein. Thereafter, and at or about the time the instant accounting proceeding became contested, the petitioners each retained separate counsel.
*875 It is axiomatic that legal fees may not be awarded counsel where there is a breach of the Code of Professional Responsibility. (Brill v Friends World Coll., 133 AD2d 729 [2d Dept 1987]; Shelton v Shelton, 151 AD2d 659 [2d Dept 1989].)
The attorney-draftsman having acted as cofiduciary and as counsel for this estate, notwithstanding his many conflicts which were readily apparent to him at the time, the court, accordingly, determines that he, as well as his former and successor law firms, are not entitled to legal fees. A denial of a fee under these circumstances is an effective sanction. A lawyer will be forced to weigh carefully whether or not he should accept a retainer if there is a possibility he will not be paid for the work that he performs. In addition to the Weinstock considerations, the attorney-draftsman should have declined the nomination because of his many conflicts and their possible effect on the exercise of his professional judgment. Insofar as the enhanced commissions clause is concerned as it pertains to the attorney-draftsman this constitutes a bequest to him of any amount which exceeds the normal statutory commissions. Consequently, the strictures enunciated in Matter of Putnam. (257 NY 140 [1931]) are applicable herein.
The fees claimed by trial counsel representing the attorney-draftsman and trial counsel representing the bank are disallowed since their services were rendered to support their position in this litigation and not to further the interests of this estate.
The following disbursements are deemed reimbursable: Alexander & Green, Esqs., the sum of $1,850.30, Pelletreau & Pelletreau, Esqs., the sum of $35, and Walter Conston, Alexander & Green, Esqs., the sum of $1,912.37. Any and all other requested disbursements are hereby disallowed since they constitute law office overhead.
Any and all fees, disbursements, and commissions received from this estate not in conformity with the findings contained herein shall be remitted forthwith and proof of payment thereof shall be submitted to the clerk of the court within 10 days of the date hereof.
Unfortunately, the attorney-draftsman’s flagrant violations of the Code of Professional Responsibility cannot be ignored and, consequently, the chief clerk of the court is directed to forward a copy of this decision to the appropriate Grievance Committee for its consideration.